671 A.2d 463

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**John Wheeler GLENN.**

**Misc. (Subtitle BV), No. 1, Sept. Term, 1994.**

Court of Appeals of Maryland.

Feb. 8, 1996.

450

Melvin Hirshman, Bar Counsel, and John C. Broderick, Assistant Bar Counsel, for the Attorney Grievance Commission of Maryland, for Petitioner.

John Wheeler Glenn, Baltimore, pro se.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RAKER, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition with this Court for disciplinary action against John Wheeler Glenn, Respondent, alleging violations of the Rules of Professional Conduct. The Attorney Grievance Commission charged Respondent with violating Rule 1.15(a), Rule 5.3(a), (b), and (c), Rule 8.4(c); Rules BU4, BU7, and BU9; and Maryland Code (1989, 1995 Repl.Vol., 1995 Supp.) § 10–306 of the Business Occupations and Professions Article.[1] We referred the matter, pursuant to Maryland Rule BV9(b), to Judge Clifton J. Gordy of the Circuit Court for Baltimore City, to make findings of fact and conclusions of law in accordance with Maryland Rule BV11(a). After an eviden-

---

1. Unless otherwise indicated, all statutory citations herein are to Maryland Code (1989, 1995 Repl.Vol., 1995 Supp.) § 10 of the Business Occupations and Professions Article.

tiary hearing, Judge Gordy concluded that Respondent violated Rule 1.15(a), Rule 5.3(b) and (c), Rule 8.4(c), Rule BU9, and § 10–306. Judge Gordy found that Bar Counsel had not proved by clear and convincing evidence that Respondent had violated Rule 5.3(a), Rule BU4, and Rule BU7. Respondent filed exceptions to certain findings and conclusions in this matter.

## I.

Judge Gordy held an evidentiary hearing and filed an extensive report. We set forth below his findings of facts and conclusions of law.

### BACKGROUND FACTS

Respondent is an attorney, licensed to practice law in the State of Maryland since 1963. Respondent is fifty-seven (57) years old. He currently practices law with the firm of Preston & Glenn located in Baltimore. Respondent has had no prior complaints filed against him by the Attorney Grievance Commission. From 9/01/87 through 9/92, Respondent was the sole principal in the law firm of Preston and Glenn.

Prior to 1987, Respondent was never exposed to bookkeeping or accounting. Before he formed the firm of Preston & Glenn, he and his former partners employed a full-time bookkeeper, Mrs. Waldred Borman until 1985. After she retired, Mrs. Roger Smith, the wife of the firm's partner, was hired as the firm's full-time bookkeeper. Mrs. Smith had experience bookkeeping previously for a car dealership in Anne Arundel County.

Roger Smith decided to open an office in Glen Burnie, and Mrs. Smith worked there as the sole bookkeeper for the firm. Thereafter in August, 1987, Roger Smith decided to leave the firm entirely, so he and Respondent divided the firm account equally. The firm savings account was equally divided, and Respondent retained the shortage list that Mrs. Smith comprised. Mr. Smith kept his client's; Respondent kept his clients. The total funds retained on behalf of the

clients in escrow for Preston and Glenn was two thousand, seven hundred and thirty-one dollars and fifty-eight cents ($2,731.58). The remaining firm monies that resulted from the division of the original firm account were deposited into the escrow account retained by Preston and Glenn to compensate for the existing shortage.

The bookkeeper employed by Preston and Glenn, was Donna Grace. Donna Grace had previously been employed by Respondent in the capacity of administrative secretary when she became the firm's part-time bookkeeper.

Terri Jarman became bookkeeper for Respondent on March 4, 1989 and her bookkeeping responsibilities continued up until November 9, 1990.

She advised the Respondent that she was concerned that the escrow account was in the "same jumble" as the firm ledger book. She testified that she could not "figure out" the escrow account. Ms. Jarman asked Respondent twice if she could get assistance with the escrow account. The Respondent advised her that accountants could be called in to assist her with the firm account, but he felt that there was no need to "straighten out" the escrow account at that time.

Toni Durham, Sandra Trueth and Patricia Bailey were hired as bookkeepers in succession on November 10, 1990; April 26, 1991; and October 19, 1991, respectively.

Beginning August 31, 1987, Preston and Glenn established its own bookkeeping department. An office manual was prepared to set forth the expectations and responsibilities of the bookkeeper.

Toni Durham became the bookkeeper in November 10, 1990, and continued in that capacity until April 25, 1991. Toni Durham testified that she never reviewed the escrow account bank statements when she began working at Preston and Glenn. Rather, she just referred to the balance of the checkbook and the ledgers.

Respondent was the only individual with signature authority on the escrow account. Whenever a check was

written against the escrow account, it was sent to the Respondent with a note indicating the balance.

### FACTS RELEVANT TO THE HILNBRAND MATTER

On July 12, 1990, the Respondent received settlement funds on behalf of his clients, the Hilnbrand file. Those funds were deposited on the same day, in the amount of twenty thousand, five hundred dollars ($20,500.00). Then, Respondent extracted monies from the escrow, in the amount of five thousand, one hundred and twenty-five dollars ($5,125.00), which was due to him in exchange for his legal services.

On February 22, 1991, there was supposed to be fifteen thousand, eight hundred and eighty-four dollars and seventy-one cents ($15,884.71) in the escrow account on behalf of the Hilnbrands. Before the Hilnbrands received their first check the balance of the escrow account was only thirty-three hundred and fifteen dollars and thirty-nine cents ($3315.39). On February 22, 1991, the Respondent disbursed, to the Hilnbrands, a check for two thousand, four hundred and four dollars and thirteen cents ($2,404.13). This was the first check written to Judith Hilnbrand in connection with the settlement. After that check was written, the balance in the escrow account was nine hundred and eleven dollars and twenty-six cents ($911.26). Thereafter, the Hilnbrands were furnished twenty-five hundred dollars on 8/14/91. Before that check was issued to them, Respondent was responsible for thirteen thousand, four hundred and forty-eight dollars ($13,448.00) in trust for the Hilnbrands. At least twice, after settlement, the escrow account revealed balances that indicated there were monies out of trust.

Although the funds from the Hilnbrand settlement were received by Respondent on July 12, 1990, the first disbursement thereof to the client was not until February 1991. The delay was attributed to resolving a subrogation matter involving H.M.O. and the Hilnbrands were aware of the reason for the delay.

When Respondent informed the Hilnbrands, in August of 1990, that there were complications in regard to satisfying the outstanding medical balances, the Hilnbrands responded that they understood and, furthermore, "do not want that kind of money in their bank account." The Hilnbrands requested that Respondent withhold distribution of the settlement funds until their son received his college grant.

Then, in February 1991, Mr. Harry Hilnbrand requested, via telephone, that Respondent keep fourteen thousand, eight hundred and eighty-three dollars and twenty-seven cents ($14,883.27) in trust, and send the rest to them. Hence, in February, 1991, Respondent was still responsible for the safekeeping of at least fourteen thousand, eight hundred and eighty-three dollars and twenty-seven cents ($14,883.27) on behalf of the Hilnbrands. The escrow account for the month of February showed a balance as low as three thousand, three hundred and fifteen dollars and thirty-nine cents ($3,315.39).

On or about November 21, 1991, Respondent issued a check to the Hilnbrands in the amount of two thousand dollars ($2,000.00). At the time of that disbursement, the Hilnbrands still had seventy-four hundred and forty-eight dollars and eight cents ($7,448.08) entrusted with Respondent. The escrow balance was sufficient to pay that outstanding obligation to the Hilnbrands. But, the Wolfs, also Respondent's clients, would not have been able to receive all their funds in the escrow due to them had they requested their money at that time.

On May 27, 1992, the balance in the escrow account totalled three hundred and forty-five dollars and forty-one cents ($345.41). The Hilnbrands, however, were still due monies from their settlement which was an excess of twelve thousand dollars ($12,000.00). Therefore, Respondent was over $12,000 out of trust in regard to the Hilnbrands. The Respondent explains in that instance that the money "obviously had been previously transferred from the escrow to the firm account."

According to the testimony of Sterling Fletcher, who was assigned as an investigator by the Attorney Grievance Commission of Maryland in connection with this case, at least six clients have suffered a negative balance in regard to their individual funds due them in the escrow account. He further testifies that one of the bookkeepers, Toni Durham or Terri Jarman, mentioned to him, during an interview associated with his investigation, that there were shortages in the escrow account, and moreover, Respondent instructed them to transfer funds from the escrow account to the firm account for the purpose of satisfying payroll.[2]

### FACTS RELEVANT TO THE WOLF MATTER

The settlement memorandum for Frank and Agnes Wolf was prepared on October 2, 1991. The settlement resulted in a total of thirty-one thousand dollars ($31,000.00), and a deposit was made on their behalf on September 23, 1991. The attorneys' fees and expenses totalled nine thousand, three hundred and thirty-three dollars and thirty-three ($9,333.33). According to the settlement memorandum, the Wolfs were entitled to eight thousand, eight hundred and seven dollars and ninety-four cents ($8,807.94). Mr. Wolf signed the settlement statement dated October 2, 1991 to the effect that he received eight thousand, eight hundred and seven dollars and ninety-four cents ($8,807.94). The outstanding "disbursements" totalled twelve thousand, eight hundred, fifty-eight dollars and seventy-three cents ($12,-858.73). Therefore, that money due to varied lien holders was supposed to be kept in trust on behalf of the Wolfs.

In June 1992, there were still liens outstanding that were to be satisfied by the Wolfs' funds, one of which was on

---

2. In a footnote, the court noted that "neither Toni Durham nor Terri Ann Jarman testified that they were directed to make such a transfer. In fact, Toni Durham stated that Respondent transferred from his *personal* account to the firm account, and from the firm account to the escrow account. This dispute of fact is irrelevant because the violation will be grounded in Respondent's failure to keep firm monies and clients' monies separate."

behalf of Deerhead State Hospital, in the amount of twelve thousand, five hundred and twenty-nine dollars and thirty-five cents ($12,529.35). In the month of June, however, the escrow account descended below that amount to only three hundred, forty-five dollars and forty-one cents ($345.41), and once to forty-two hundred seventy-four dollars and thirty-six cents ($4,274.36).

In August of 1991, Respondent was also keeping funds for his other clients, the Hilnbrands, who are complainants in regard to this Petition, as well. There weren't sufficient funds to pay the Wolfs had each client demanded payment simultaneously. Nevertheless, Respondent issued two checks in August, 1991, one for twenty-five hundred dollars ($2500.00), and one for fifteen hundred dollars ($1500.00).

After the two checks were distributed, the Hilnbrands still had ninety-four hundred, forty-eight dollars and eight cents ($9448.08) entrusted to Respondent. The escrow account balance, however, was fourteen thousand, two hundred and forty-two dollars and ninety-one cents ($14,242.91). This was not enough money to honor the Wolfs' trust account totalling eight thousand, six hundred and five dollars and forty-four cents ($8,605.44) at the time.

Mr. Wolf misadvised Respondent, in 1991, that there was a Medicare lien to be satisfied from his settlement funds. This misinformation relayed to Respondent caused a delay in distribution, and the Wolfs received a final disbursement on August 12, 1992.

On August 12, 1992, Frank Wolf was paid eleven thousand, nine hundred and thirty-seven dollars and thirty-five cents ($11,937.35), which represented the difference between the prior claim of Deerhead Hospital and the actual claim of Deerhead Hospital.

### CONCLUSIONS OF LAW AND DISCUSSION

For each matter complained of herein concerning the Hilnbrands and the Wolfs, Petitioner alleges that the Respondent violated the Maryland Rules of Professional Con-

duct, Rules 1.15(a) and 5.3(a), (b) and (c); Rule BU4, 7 and 9; and Business Occupation Article Section 10–306. Petitioner only advances the disciplinary charge under Rule 8.4(c) in regard to the Hilnbrands.

A. This court finds by clear and convincing evidence that the Respondent, John Wheeler Glenn, has violated:

1. The Maryland Rules of Professional Conduct, 1.15(a) by failing to hold the property, specifically the settlement funds of his clients, the Hilnbrands and the Wolfs, separately from his own property, and furthermore keep the escrow and firm accounts separate pursuant to Rule BU7 [3] of the Maryland Rules;

2. Rule BU 9 which prohibits an attorney from "borrowing or pledging any funds required by these Rules to be deposited in an attorney trust account ... or use any funds for any unauthorized purpose;"

3. Rule 8.4(c) was violated by engaging in conduct involving dishonesty;

4. Business Occupations and Professions, Section 10–306 which prohibits a lawyer from using trust money for "any purpose other than the purpose for which the trust money is entrusted to the lawyer"; and

5. Rule 5.3(b) and (c) by failing to ensure that the bookkeepers did not engage in conduct that is incompatible with Respondent's legal obligation.

### (1) *Violation of Rule 1.15*

Rule 1.15(a) states:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. *Funds shall be kept in a separate account* maintained pursuant to Subtitle BU of the Maryland Rules. Other

---

**3.** We note that in the discussion portion of Judge Gordy's conclusions of law, he finds that Respondent did not deposit any inappropriate funds into the escrow account.

property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

Respondent asserts that the instances that monies were transferred from the firm account to the escrow account were not violations of the Rules because the Rules permit transfers from operating accounts to escrow accounts. Rule 1.15(a) does not prohibit such a transfer, but it also does not affirmatively allow such a transfer.

The Rule states that the escrow account and the firm account should be held separately: "A lawyer shall hold property of clients ... separate from his own property." However, the facts indicate that Respondent needed to transfer from the firm account to the escrow account to make his clients whole. This court logically draws the inference that there would be no need to compensate the clients if their funds had not previously been invaded.

Respondent asserts "there is absolutely nothing out of the ordinary about such transfers from operating to escrow accounts." Additionally Respondent states that "[H]is bookkeepers would inform him that the balance in the escrow account was low, thereby requiring a transfer from the operating account so as to make a payment on contemplated litigation expenses." This court rejects that proffer as a justification for depositing funds from the operating account into the escrow account because there are instances where such a transfer occurred and for the purpose of replenishing funds that should have been there for the duration of time since the settlement was effected. If, in fact, litigation expenses were incurred, Respondent could have advanced those funds to his client in accordance with the Rules, and thereafter seek reimbursement. However, the circumstances presented to this court, illustrate that the Respondent was actually *replacing* funds that, pursuant to the Rules, were to be kept separate from the Respondent's funds.

Respondent states that "[T]he transfers from escrow to the operating account ... represented a transfer of earned fee ... Admittedly, on several occasions such transfers did not carry a legend on the check, ... but as clearly indicated by Respondent's Exhibit 35, each and every transfer of fee ... represented an earned fee transfer ..." Respondent's argument is that the transfers from escrow to operating account were legitimate. This court finds that such transfers were violations of the Rule 1.15(a) because a *legitimate* withdrawal of fees would not have caused the escrow account to be deficient in regards to obligations to clients and lienholders.

Furthermore, the Respondent testifies that he was aware that there were two instances in which the escrow account balance on the Hilnbrand and Wolf file descended below the amount necessary to fulfill the settlement obligation due to the client. These shortages occurred once in 1991, and once in 1992; and also constitute violations of Rule 1.15(a). Therefore, the allegation of violation of Rule 1.15(a) by Petitioner is sustained.

### (2) *Violation of BU9*

Next, Respondent contends, and there is testimony of Respondent's bookkeepers that he did not borrow money from the escrow account and deposit it into firm accounts and there was never a time when there was insufficient funds in the escrow account. However, as the court noted above, that fact is in dispute. According to Sterling Fletcher, one of the bookkeepers for Respondent, either Toni Durham or Terri Ann Jarman informed him that Respondent has transferred funds from the escrow account, to satisfy payroll, into the firm account.

BU9 states: "An attorney ... may not borrow or pledge any funds ... to be deposited in an attorney trust account ... or use any funds for any unauthorized purpose." Although Petitioner has failed to demonstrate the exact "unauthorized purpose" for which Respondent misused clients' funds, the fact that the escrow account fell below the

balance necessary to fulfill legitimate obligations to clients and lienholders indicates an "unauthorized use" contemplated by the Rule. Since Respondent admits to at least two shortages in the escrow account, this court finds that there has been unauthorized use of the clients' funds and therefore, a violation of BU9.

### (3) *Violation of Rules of Professional Conduct 8.4(c)*

Petitioner alleges that Respondent violated the Rules of Professional Conduct, specifically Rule 8.4(c):

It is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . .

The facts presented by Petitioner clearly and convincingly establish that the Respondent engaged in conduct involving dishonesty when Respondent obliged his client's desire not to disburse their funds to them.

The conduct that Petitioner calls into question relates to Respondent's "acting in concert ... to assist them to keep from disclosing the assets ... so as to enable their college-aged son ... to maximize a tuition grant or other financial assistance." Respondent asserts that he was merely following the directive of his client. Respondent was aware that the Hilnbrands were declining disbursement at the time for the purpose of secreting the settlement funds. Therefore, Respondent's conduct, withholding the funds, was not merely compliance with the request of this client. The Respondent was engaging in conduct involving dishonesty. Consistent with this court's finding of facts, Respondent was informed by his clients that they wanted him to keep the funds they were entitled to at the time for the *specific purpose* of misrepresenting their assets. This court finds as a matter of law that Respondent's willful compliance with the Hilnbrands' plan to purposely provide false information by withholding their funds constitutes the type of conduct prohibited by Rule 8.4(c) involving dishonesty and deceit.

#### (4) *Violation of Business Occupations and Professions, Section 10–306*

Petitioner has successfully established by competent testimony and documentary evidence that the Respondent has violated Business Occupations and Professions Section 10–306 which states it is impermissible for a lawyer to use trust money for any purpose other than that purpose for which the client has entrusted those monies to the lawyer.

First, Respondent has conceded that sums of monies were out of trust. In regard to the Hilnbrands, in May of 1992, the escrow account balance was insufficient to cover the amount still due to the Hilnbrands. Indisputably, there were funds out of trust for that client. Respondent concludes that the monies were transferred to the firm account. However, he does not offer a reason, nor can his client ledger clarify the matter.

In the absence of evidence that the escrow's deficit was caused by an appropriate reimbursement or legal fee, this court finds that Respondent *must have* misused those monies in violation of Section 10–306 of the Business Occupations and Professions Rules. Respondent had already extracted his fees from the Hilnbrands' funds in the amount of five thousand, one hundred and twenty-five dollars ($5,125.00) shortly after the settlement funds were deposited in February of 1991. There weren't any further legal services to be charged to the Hilnbrands as far as the record indicates, yet monies were apparently withdrawn to the point where entrusted funds were violated.

As to the Wolfs' escrow account, Respondent did not maintain a balance sufficient to satisfy the outstanding liens totalling an excess of $20,000.[4] As one point, in the month

---

4. In a footnote, Judge Gordy noted that "Respondent and his client were unaware that the liens were actually far less than anticipated (Deerhead Hospital was not owed $12,529.35 but only 592.00 because Medicare had covered it. Nonetheless, the funds were not available to meet the original assumed obligation to Deerhead. The difference between the $12,529.35 and $592.00 still belonged to the Wolfs, and the funds were to remain in trust.

of June, 1992, the balance was inadequate to refund the client the difference because there simply was not $12,-529.35 in the account.

The Wolfs were paid the correct amount on August 12, 1992, eleven thousand, nine hundred and thirty-seven dollars and thirty-five cents ($11,937.35), and Respondent contends that neither client was harmed. Further, Respondent asserts that the Wolfs gained more money due to Respondent's diligent investigation into the true lienholders and their respective entitlements. This court finds that contention irrelevant to the defense of allowing and/or causing the escrow account's balance to fall to the point where those entitled to the funds cannot access the funds. This court finds that although the Petitioner has not illustrated for which purposes the absent funds were used, an inference can be drawn that it was used for some other purpose than that which it was entrusted. Summarily, Respondent's conduct, resulting in insufficient funds to pay client obligations is a breach of his fiduciary duty and an invasion of the assets of his client. Therefore, this court is convinced that Respondent has violated Section 10–306 of the Business Occupations and Professions Rules in connection with the Hilnbrand and Wolf matters because (1) there were funds missing that Respondent admittedly cannot account for; and (2) the escrow account suffered balances too low, reflecting funds out of trust.

### (5) *Violation of 5.3(b) and (c)*

According to Rule 5.3, "with respect to a nonlawyer employed or retained by or associated with a lawyer:

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer. . . ."

The facts presented to this court suggest that Respondent failed to ensure that the bookkeepers were complying with his obligation as a lawyer, and not, for example, invading the clients' funds. Respondent testifies that he directed his

bookkeepers to "never permit a transfer which will bring the balance of the escrow account below that total amount representing trust or escrow funds we are holding for clients or others." However, his bookkeeper, Toni Durham, testified that she had not read this manual purporting that directive. Hence, Respondent did not ensure that his employees' conduct was compatible with his obligations if he did not make sure that everyone was aware of the safeguards.

Additionally, his bookkeeper, Terri Jarman, testified that the accounts were "a jumble." Ms. Jarman testified that she could not "figure out" the firm account, and requested assistance with eliminating the confusion associated with the escrow account and Respondent did not allow for such assistance in regard to the escrow account. And, most significantly, Respondent admits to two shortfalls in the escrow account, one in 1991 and one in 1992. However, the shortfalls were brought to his attention as a result of investigation triggered by this Petition.

Although Respondents' office policy appeared satisfactory in regard to complying with the Rules, and the manual set forth appropriate standards, this court finds that Respondent failed to make reasonable efforts to ensure that the bookkeepers' actual practices are compatible with the professional obligations of the lawyer. For example, there is competent testimony from Respondent's former bookkeeper that she never reconciled the bank statements, i.e., made comparisons of the bank statements with the escrow account. Furthermore, she admits that she "didn't know what to do." Evidently, Respondent did not undertake reasonable efforts to ensure that the non-lawyers, specifically bookkeepers at his firm, complied with his professional obligations.

Ms. Durham also testifies that she never went "through all of the client ledgers, total them up to see how much money was supposed to be maintained on behalf of those clients and compare it to the balance on a monthly statement." Moreover, she was also never trained to do so. Ms.

Durham explained that she did enter checkbook data on client ledger cards to determine whether the balances were negative. However, a negative balance is not the signal, it is the extreme. The bookkeepers are not supposed to allow the escrow balances to fall to a point where the account is out of trust.

In regard to the office manual, there is evidence that Ms. Durham initialed the margin of page four (4). (Respondent sets forth that fact to illustrate Ms. Durham's notification of the instructions therein.) However, Ms. Durham testifies that she did not read the section on functions of the bookkeeper in the manual. Ms. Durham states that although Respondent advised her predecessor, Terri Jarman to make it clear to Ms. Durham that Ms. Durham was to reconcile the bank statements and checkbooks, Ms. Jarman never showed Ms. Durham how to do so. Therefore, Ms. Durham *never* reconciled them. Ms. Durham also states that she informed Respondent that "she didn't fully understand" the "books of the law firm."

Furthermore, Ms. Jarman testifies that she could not "figure out" the escrow account. She asked Respondent to acquire some assistance but she only received help with the firm account. Respondent declined her request for an accountant's assistance with the escrow account.

When Ms. Jarman was being replaced by Ms. Durham, Ms. Jarman went over the ledger book and the routine of entering checks. Ms. Jarman testified that she trained Ms. Durham "up to where I could understand how to do it." Specifically, Ms. Jarman showed Ms. Durham (1) how to make entries on the ledger sheet; (2) entering the check number and recipient; and (3) to subtract the amount. Ms. Jarman indicates that she taught Ms. Durham how to reconcile the bank statement and the ledger sheets: "[W]e basically went over that. It's like taking care of a checkbook." Obviously, that training did not suffice. There is no such simplicity to handling the escrow account. Ms. Jarman even admits that when she attempted to reconcile an escrow account on her own, "it wasn't coming out right."

Ms. Jarman was originally hired as a secretary, and she doesn't remember reviewing the section of the manual, "functions of a bookkeeper," when she undertook bookkeeping duties. A memo indicating that she read the manual bears her initials, but she initialed it when she was first hired. Therefore, this court does not find that Ms. Jarman actually read the relevant section of the manual.

However, Respondent also gave Ms. Jarman a memo less than one month after she became the bookkeeper, requesting that she review the bookkeeper's instructions in the manual, and he wanted to discuss the status of the escrow accounts. This court is not convinced that the discussion ever occurred.

Neither bookkeepers, Terri Jarman or Toni Durham, testified that they recognized any shortages in the clients' account. Therefore, Respondent contends that he was never made aware of any shortages. This court makes the factual finding that no shortages were revealed because the escrow account was not thoroughly investigated by Respondent or an employee. The testimony indicates that neither bookkeeper would have determined a shortage because neither adequately reconciled the escrow account.

This court makes the following conclusions of law regarding Rule 5.3(b): Respondent devised adequate instructions for the bookkeepers in his employ. However, he violated section (b) of Rule 5.3 by failing to take reasonable steps in ensuring that the bookkeepers did not engage in conduct incompatible with Respondent's obligation. The escrow account balances were revealing *at least* two shortfalls. This court finds that Respondent should have eliminated the confusion, of which he was on notice, concerning all accounts when his bookkeepers expressed their lack of success in reconciling and understanding the account. He was advised on more than one occasion that the escrow account was not comprehensible. Therefore, the allegation of a violation of Rule 5.3(b) is sustained.

Rule 5.3 states that:

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Although Respondent testifies that he was not made aware that the shortages existed, or even the probability that they were about to occur, this court finds that Respondent, the individual with signature authority, had the knowledge that a transfer of certain monies was going to bring the escrow account balance to an unacceptable minimum. This is especially true in the instance where the escrow account fell into the mere hundreds. At that time, Respondent could not have been ignorant to the fact that the escrow account may have been in grave jeopardy. The evidence illustrates that the escrow account was not holding funds for such a voluminous number of clients that Respondent could not ascertain that the balance was or about to become rather low. In regard to Rule 5.3, this court finds by clear and convincing evidence that Respondent failed to make reasonable efforts to ensure that the non-lawyers' conduct was compatible with his legal obligations. Therefore, the allegation of violation of Rule 5.3(c) is also sustained.

B. The following disciplinary charges petitioned by the Attorney Grievance Commission against Respondent, John Wheeler Glenn have not been violated:

6. Rule BU4, which sets forth the required deposits in regard to trust account;

7. BU7, which sets forth the exceptions to those funds required to be deposited in an account governed by Rule BU4; and

8. 5.3(a) which sets forth the Respondent's responsibilities regarding non-lawyer assistants.

### (6) *Violation of Rule BU4*

Rule BU4 states that:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution.

The disciplinary charge petitioned by the Attorney Grievance Commission against Respondent under this Rule is not sustained by clear and convincing evidence. Although this court finds that there were shortages in the escrow account thereby making it impossible for clients to either obtain the funds in its entirety or for lienholders to collect their entitlements, this court does not find a violation of Rule BU4. The facts demonstrate that Respondent deposited the settlement funds into appropriate trust accounts. Petitioner has not established by clear and convincing evidence that settlement funds, or any funds were not properly deposited immediately after settlement; the alleged violation of Rule BU4 is not sustained.

### (7) *Violation of Rule BU7*

BU7 which states that:

a. *General Prohibition*

An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule BU4 or permitted to be so deposited by section b of this Rule.

b. *Exceptions*

1. An attorney or law firm may deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, and any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

Likewise, Petitioner has not clearly and convincingly established that Respondent failed to deposit only those funds permitted by this Rule. Although Respondent deposited funds from the operating account to the escrow, those funds still rightfully belonged in the escrow account. Therefore, this court is not convinced that Respondent deposited any funds that were inappropriate into the escrow account.

### (8) *Violation of Rule 5.3(a)*

Pursuant to section (a) of Rule 5.3:

[A] partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer[.]

This court finds that the testimonial and documentary evidence is void of any indication that Respondent failed to provide "measures" to ensure that those non-lawyers in his employ exhibited conduct compatible with Respondent's ob-

ligations as a lawyer. In fact, Respondent devised a manual, setting forth the bookkeeping regulations for his staff.

Moreover, Respondent advised his staff that "if you are ever requested to make a transfer which will create the above deficit in the escrow account, you must immediately inform the office manager in writing with a memo of this but do not make the transfer of funds." This policy demonstrates Respondent's reasonable efforts to ensure that his bookkeepers did not withdraw funds that would belong to the clients. Additionally, the bookkeepers were also advised that "the only sums which may be transferred from the escrow to firm account are normally amounts representing earned fee over and above amounts belonging to a client." Furthermore, the bookkeeper was instructed to "keep a running account on separate paper of the ... escrow funds we are holding for a client." Additionally, the bookkeepers were told to "bring to the attention of the office manager, whenever you feel that the balance of an account ... either escrow or firm account, is becoming too low, or when you realize that a large amount will soon be drawn out of an account, such as with payroll nearing." These directive were, among others, compiled in the office manual. This Court finds that Respondent made reasonable efforts to ensure proper policy existed and the non-lawyers' conduct was compatible with Respondent's obligations as an attorney. Therefore, this Court is not convinced by clear and convincing evidence that reasonable measures were not undertaken by Respondent and the allegation of a violation of Rule 5.3(a) is not sustained.

In summation, Judge Gordy found that Respondent violated Rules 1.15(a), 5.3(b) and (c), and Rule 8.4(c) of the Rules of Professional Conduct; Rule BU9; and § 10–306. Respondent excepts to the findings of facts and conclusions of law; he maintains that all facts before the trial judge indicate non-intentional violations of the Rules of Professional Conduct. He concludes, therefore, that Bar Counsel has not sustained his burden of proof to any of these charges.

## II.

It is well settled that this Court has original jurisdiction over disciplinary proceedings. *Attorney Griev. Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992); Md.Rule BV9(b). In the exercise of this responsibility, "we [make] an independent, detailed review of the complete record with particular reference to the evidence relat[ed] to the disputed factual finding." *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973). The burden is on Bar Counsel to establish the allegations by clear and convincing evidence. Rule BV10(d); *Marshall,* 269 Md. at 516, 307 A.2d at 681. In order to establish factual matters in defense of his position or to demonstrate that mitigating circumstances existed at the time of the alleged misconduct, Respondent bears the burden of proving these matters by a preponderance of the evidence. *Powell,* 328 Md. at 288, 614 A.2d at 109. In our review, we must keep in mind that the findings of the trial judge are *prima facie* correct and will not be disturbed unless clearly erroneous. *Attorney Griev. Comm'n v. Kemp,* 303 Md. 664, 674, 496 A.2d 672, 677 (1985); *Attorney Griev. Comm'n v. Collins,* 295 Md. 532, 548, 457 A.2d 1134, 1142 (1983) (quoting *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 678, 431 A.2d 1336, 1349 (1981)). We give due regard to the trial judge's finding on credibility, as the trial judge is in the best position to assess the witnesses' credibility. *Attorney Griev. Comm'n v. Bakas,* 323 Md. 395, 402–03, 593 A.2d 1087, 1091 (1991). The ultimate determination, however, as to an attorney's alleged misconduct is reserved for this Court. *Id.,* 593 A.2d at 1091.

Respondent filed exceptions to Judge Gordy's factual findings and legal conclusions that he violated Maryland Rules of Professional Conduct 1.15(a), 5.3(b) and (c), and 8.4(c); Rule BU9; and § 10–306. For the most part, Respondent's exceptions center around one theme: that he had no knowledge that the cash balance in his client escrow account was insufficient to satisfy the amounts that were owed to clients Hilnbrand and Wolf and, therefore, the trial judge erred in concluding that he violated the Rules of Professional Conduct. Although

Respondent conceded before Judge Gordy that certain ethical violations do not require proof of intent or knowledge on the attorney's part, he nonetheless asserts lack of knowledge and intent as defenses to the charges before this Court. He makes three points: 1) that the trial judge erred in finding that he had knowledge of the shortages in the escrow accounts; 2) that without the requisite knowledge, he cannot be found to have violated the Rules; and 3) that at most, his conduct was mere neglect which does not warrant disbarment. In regard to the Hilnbrand matter, he argues that he was merely following the directions of his client in delaying payment, and that this conduct does not seriously adversely reflect upon the lawyer's fitness to practice law.

### Violation of Rule 1.15(a)

We shall first address Respondent's exception to Judge Gordy's finding that he violated Rule 1.15(a). Rule 1.15(a) states:

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. *Funds shall be kept in a separate account* maintained pursuant to Subtitle BU of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(emphasis added). Respondent's sole exception to this finding is that he was unaware that his attorney trust account balance fell below the amount necessary to fulfill his obligations to the clients. Respondent admitted that shortages in the escrow account existed, once in 1991, and again in 1992, but he maintains that he was first made aware of these shortages on August 28, 1992 by Mr. Fletcher, the Bar Counsel investigator. He notes the testimony of the two bookkeepers during the relevant period that they never informed him, nor were aware themselves, that shortages existed. Respondent asserts that absent the knowledge that the escrow account was

out of trust, his conduct can only be deemed unintentional, not knowing or willful. He maintains that the absence of these elements precludes a finding of violation of Rule 1.15(a) and Rule BU9.

The short answer to this exception is that an unintentional violation of this rule, with certain limited exceptions not applicable here,[5] is still a violation of the attorney's affirmative duties imposed by the rule. Rule 1.15 addresses the lawyer's duty with regard to receiving and safeguarding property belonging to a client. Rule 1.15(a) requires an attorney to keep clients' funds in a separate account and "to ensure that client funds are used only on the client's behalf and not for the lawyer's personal or business purposes." *Model Rules of Professional Conduct* Rule 1.15 cmt. ("Misappropriation and Conversion"), *reprinted in Annotated Model Rules of Professional Conduct* 255 (2d ed. 1995). Failure to maintain the integrity of client funds violates the requirements of Rule 1.15. The mere fact that the balance in an attorney trust account falls below the total amounts held in trust supports a *prima facie* finding of violation of the rule. *See Giovanazzi v. State Bar of California,* 28 Cal.3d 465, 169 Cal.Rptr. 581, 619 P.2d 1005 (1980). Improper intent is not an element. *See In re Pels,* 653 A.2d 388, 394 (D.C.App.1995); *In re Marlow,* 652 A.2d 1111, 1113 n. 3 (D.C.App.1995); *In re Micheel,* 610 A.2d 231, 233 (D.C.App.1992). This Court has consistently found inadvertent conduct that results in an escrow account deficit to be a violation of Rule 1.15. *See Attorney Griev. Comm'n v.*

---

5. *See* Rule BU12, "Enforcement," which provides that:

Upon receipt of a report of overdraft on or dishonored instrument drawn on an attorney trust account, Bar Counsel shall contact the attorney or law firm maintaining the account and request an informal explanation for the overdraft or dishonored instrument. The attorney or law firm shall provide any records of the account necessary to support the explanation. If Bar Counsel has requested but has failed to receive a satisfactory explanation for any overdraft or dishonored check, or if good cause exists to believe that an attorney or law firm has failed to perform any duty under these Rules, Bar Counsel may secure compliance with these Rules by appropriate means approved by the Commission, including application for audit pursuant to Rule BV18 (Audit of Attorney's Accounts and Records).

*Powell,* 328 Md. 276, 614 A.2d 102 (1992); *Attorney Griev. Comm'n v. Berger,* 326 Md. 129, 604 A.2d 58 (1992); *Attorney Griev. Comm'n v. Kramer,* 325 Md. 39, 599 A.2d 100 (1991).

Judge Gordy found Respondent's failure to maintain balances in his escrow account equal to deposits made on his clients' behalf to be a violation of Rule 1.15(a). It is undisputed that Respondent's escrow account balance fell below the amount necessary to fulfill the settlement obligations to his clients.

Respondent's bank records indicate that on September 23, 1991, Wolf settlement funds in the amount of $31,000 were deposited in the escrow account. After the payment of attorneys' fees and expenses of $9333.33, and disbursement of $8,807.94 to the Wolfs, $12,858.73 was to be kept in trust to satisfy outstanding medical liens.[6] As shown in the table below, however, the balance in the account steadily dropped to only $345.41 in June of 1992:

| Date | Escrow Balance |
|------|----------------|
| November 1991 | $13,669.70 |
| December 1991 | $ 7,405.60 |
| January 1992 | $ 4,199.92 |
| February 1992 | $ 1,238.58 |
| June 1992 | $  345.41 |

On August 12, 1992, following a resolution of the actual amount of the lien due to Deerhead Hospital, the Wolfs received final disbursement in the proper amount of $11,-907.35.

With regard to the Hilnbrands, Respondent received $20,-500 as settlement funds on July 12, 1990, which he deposited in his client trust account on their behalf. He withdrew $5,125 as legal fee. On February 22, 1991, the account balance was $3,315.39. The Hilnbrands were due $14,883.27. The records show that at least twice after settlement, the balance in the escrow account indicated there were monies out of trust.

---

**6.** Through investigation, respondent learned that there were no outstanding liens, and the Wolfs were entitled to all of the money.

Judge Gordy heard testimony regarding Respondent's infusion of funds into the escrow account. He determined that Respondent did not explain the coincidental deposit of funds into the escrow account on the same day that a large check was drawn in favor of the Wolfs.[7] Judge Gordy concluded that Respondent was actually *replacing* funds that, pursuant to the rules, were required to be kept separate from the Respondent's funds.

The Respondent failed to maintain the integrity of the funds in his possession. Accordingly, Respondent's exception to the trial judge's finding of a violation of Rule 1.15(a) is overruled.

---

7. The transcript before the hearing court, on October 20, 1994 reveals the following testimony:

[THE COURT]: So you are telling me there are only two occasions that you are aware of shortfalls in the escrow account, that was in 1987 when brought to your attention by Mr. Smith, and then again in 1992, when brought to your attention by Mr. Fletcher?

[MR. GLENN]: That's correct.

[THE COURT]: If that be true, just out of curiosity, before we end today, how would you explain the fortuitous infusions of money into the escrow account which are documented for purposes of—during the course of this hearing, and then checks written shortly thereafter to clients? Are you aware of those circumstances?

[MR. GLENN]: Shortly thereafter to what?

[THE COURT]: To clients.

There were circumstances where there was a—negative—where there was a lesser amount than should have been in escrow accounts over a period of time.

There was suddenly an unexplained infusion into the escrow account, and then shortly thereafter, checks written to clients.

[MR. GLENN]: I can't take any specific instance, your honor, such as X date when there was money that was transferred from the—when there was money transferred from the firm to the escrow or escrow to firm.

The reason I can't do that is because, as I have already testified to your honor, I have no independent recall of a specific event. It just doesn't happen that way.

There are, and in my later testimony, I will refer to specific bank entries where I recognize something that is there, and that, therefore, recalls to me an event.

[THE COURT]: All right.

Mr. Broderick, you are aware of instances I referred to?

[MR. BRODERICK]: Yes, I am, your honor.

[THE COURT]: All right.

## Violation of Rule BU9

Respondent also excepts to Judge Gordy's finding that he violated Rule BU9. Respondent contends that Bar Counsel must identify the unauthorized purpose for which he misused clients' funds in order to establish this violation. We disagree with this interpretation of the rule.

Rule BU9, "Prohibited Transactions," provides, in pertinent part:

> An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, *or use any funds for any unauthorized purpose.*

(emphasis added). The relevant portion of Rule BU9 prohibits an attorney from using funds deposited in an attorney trust account for any unauthorized purpose. After consideration of all of the evidence, Judge Gordy concluded that because Respondent's escrow account fell below the balance necessary to fulfill obligations to clients and lienholders, his use of the funds was for an "unauthorized purpose."

Respondent excepts to this finding on three grounds: 1) that he had no knowledge of the shortage in the escrow account until long after the shortage existed, 2) that the trial judge relied on inadmissible hearsay to find that he knew of the shortages, and 3) that the trial judge erred in finding a violation because Bar Counsel failed to demonstrate the exact unauthorized purpose for which Respondent misused clients' funds. We agree with Judge Gordy that when the escrow account balance fell below the amount necessary to fulfill legitimate obligations to clients and lienholders, under the circumstances of this case, there was sufficient evidence for him to find an "unauthorized use" of the funds contemplated by the rule.[8] Therefore, we need not address Respondent's remaining arguments.

---

8. Although Judge Gordy did not specifically state the "improper purpose" for which Respondent used the escrow funds, the bank records

██ Absent a satisfactory explanation for an overdraft or dishonored instrument, *see* Md.Rule BU12, proof by Bar Counsel of a deficit in an escrow account by clear and convincing evidence establishes a violation of Rule BU9. Respondent does not fall within the purview of Rule BU12, and in any case, failed to demonstrate a satisfactory reason for the deficit in his escrow account.[9] Therefore, we overrule Respondent's exception.

## Violation of Rule 8.4(c)

Respondent next excepts to Judge Gordy's finding that he violated Rule 8.4(c) when he obliged his clients' request not to disburse their funds to them. Rule 8.4(c) provides, in pertinent part:

> It is professional misconduct for a lawyer to:
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation. . . .

Judge Gordy specifically found that "Respondent's willful compliance with the Hilnbrands' plan to purposely provide false information by withholding their funds constitutes the type of conduct prohibited by Rule 8.4(c) involving dishonesty and deceit." Respondent excepts to this finding. He maintains that Rule 1.13 requires him to follow the directives of his client and to zealously represent his client. He further asserts that he never advised his client as to the propriety of not revealing this "potential asset," or that the failure to disburse

---

offered in evidence included a check dated January 31, 1991, drawn on the escrow account in the amount of $3403.58, payable to Preston & Glenn, P.A., which noted in the legend "for payroll and rent."

In addition, Respondent acknowledged that the Hilnbrands had been paid 7.3% interest on their funds, totaling over $600, and he could not recall whether the interest had been paid from the firm account or from the escrow account. A principal and interest calculation for the Hilnbrand matter, however, illustrated that the checks drawn on the escrow account for payment to the Hilnbrands included interest, although the escrow account was non-interest bearing. Using escrow account funds to pay the Hilnbrands interest was also an improper purpose.

9. *See supra* note 7.

funds resulted in fraudulent behavior. He tells us that because fraud and false pretenses are specific intent crimes, Bar Counsel must prove that he "specifically intended to defraud the college authorities by virtue of not making full distribution immediately, or more properly, at the client direction, delaying distribution so as to make periodic payments when requested." He suggests that there can be no inference of specific intent to defraud anyone when he was merely following his client's directive, that there was no proof that the grant papers were fraudulent, or were filed, or that the Hilnbrands' son did receive the aid because of fraudulent papers. In sum, he maintains there was nothing dishonest about his behavior. Bar Counsel counters that Respondent was acting in concert with the Hilnbrands in misrepresenting their assets when he retained their funds after he was informed by the clients that they wanted him to keep the funds they were entitled to for the *specific purpose* of misrepresenting their assets.

Judge Gordy found that Respondent's conduct was more than *mere* compliance with the request of a client. He found that Respondent was aware that Hilnbrands were declining disbursement for the purpose of secreting the settlement funds, and that he willfully complied with their plan to provide false information by withholding their funds. He concluded that Respondent engaged in dishonest and deceitful conduct prohibited by Rule 8.4(c). We agree and overrule Respondent's exception. We also note that this money was not a "potential asset" of the Hilnbrands, but was in fact, their money. At the request of the client, Respondent retained the client's money long after he was required to do so, with the knowledge that the client intended to apply for college financial aid. Respondent's behavior enabled the client to present an inaccurate financial picture to the college and empowered the client to hide assets. It is an attempted fraud to intentionally submit a misleading grant application which will be relied upon in awarding financial aid. Bar Counsel's failure to present evidence that the Hilnbrands actually filed a false application, that the false information was relied upon, or that their son actually received a benefit from such a representa-

tion is immaterial to our finding. It is sufficient if Respondent aided the clients in their efforts to defraud or mislead the college authorities in assessing their financial picture. Because this is a disciplinary proceeding and not a criminal case, Bar Counsel need not prove fraud or false pretenses, nor must Bar Counsel prove that Respondent specifically intended to defraud the college authorities in order to establish that Respondent's conduct was dishonest or deceitful. "Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty." *In re Wilkins*, 649 A.2d 557, 561 (D.C.App.1994). We find that Respondent engaged in dishonest conduct. Accordingly, we overrule this exception.

### Violation of Rule 5.3(b) and (c)

Respondent next excepts to Judge Gordy's finding that he violated Rule 5.3(b) and (c). Rule 5.3, "Responsibilities Regarding Nonlawyer Assistants," provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer

(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when

its consequences can be avoided or mitigated but fails to take reasonable remedial action.

This rule addresses an attorney's responsibility to oversee nonlawyer employees. Respondent admits in his pleadings before the hearing court "to a degree of negligence on his part in his failure to appropriately supervise the functions of these part-time bookkeepers" and to "a degree of neglect in hiring of part-time bookkeepers with no particular experience in bookkeeping."

Judge Gordy concluded that Bar Counsel did not prove a violation of Rule 5.3(a), finding that Respondent's office procedures were reasonable efforts to ensure the integrity of the escrow account. Respondent relies on this finding to support his exceptions to the court's finding of a violation of Rule 5.3(b) and (c). He argues that because he satisfied the requirements of Rule 5.3(a), it is inconceivable that subsections (b) and (c) were violated. He further asserts that his accountant's review of the escrow account satisfied the requirements of 5.3(b) and (c). Finally, he contends that the trial judge's assertion that his bookkeepers were prohibited from contacting the accountants regarding the escrow account was contradicted by the direct testimony of his bookkeepers.

We rejected this argument in *Attorney Griev. Comm'n v. Goldberg*, 292 Md. 650, 655–56, 441 A.2d 338, 341 (1982), and we reject it here. "An attorney may not escape responsibility to his clients by blithely saying that any shortcomings are solely the fault of his employee." *Id.* at 655, 441 A.2d at 341. An attorney must ascertain that his or her employees perform their responsibilities in a competent manner.

Maryland Rules 5.3(b) and (c) concern a lawyer's duty to supervise employees; Rule 5.3(a) concerns operating procedures and measures. Rule 5.3(b) requires an attorney to make reasonable efforts to ensure that employees' conduct is compatible with the lawyer's professional obligations. Rule 5.3(c) holds a lawyer responsible for conduct of an employee that would be a violation of the rules of professional conduct if the lawyer orders, or with knowledge of the specific conduct,

ratifies the conduct involved, or if the lawyer is a partner or direct supervisor over the employee and, knowing of the conduct, fails to take reasonable remedial action to avoid the consequences of the conduct at a time when its consequences can be avoided.

Respondent introduced his office manual, which set out detailed office and bookkeeping procedures. Although he now recognizes that total reliance on his bookkeepers was insufficient to satisfy his obligation under the Rules, he tells us he relied on his bookkeepers' adherence to the internal office controls he instituted in 1987 to safeguard his client escrow account. His procedures obliged his bookkeeper to: reconcile monthly bank accounts for the firm and client escrow accounts; list all client funds in the escrow account each month; ensure that the balance in the escrow account was sufficient to satisfy all outstanding client obligations; maintain a running balance of the amount in escrow account owed to clients; address account questions to an attorney or the firm accountant; and include the balance of the operating account and the escrow account with all checks presented to Respondent for signature. Additionally, all bank statements were forwarded directly to the bookkeeper. Respondent relied on these procedures and contends that he was never informed that shortages in the escrow account existed.

Respondent also excepts to Judge Gordy's finding of fact that when Ms. Durm, one of the part-time bookkeepers, requested assistance from the accountants, Respondent told her there was no need to straighten out the escrow account at that time. Respondent is correct that the hearing court erroneously attributed the statement to Ms. Durm, when the record indicates that the statement was made by the preceding bookkeeper, Ms. Jarmon. The record supports Respondent's correction. Respondent's primary exception, however, is based on his own testimony and his denial that he never precluded the bookkeeper from discussing the record with the accountants. Judge Gordy chose to believe Mrs. Jarmon. When factual findings are in dispute, we give deference to the findings of the hearing judge unless those findings are clearly

erroneous. *Attorney Griev. Com'n v. Goldsborough,* 330 Md. 342, 356, 624 A.2d 503, 509 (1993). Judge Gordy was not clearly erroneous in accepting the testimony and therefore, we overrule Respondent's exception to this finding of fact.

Although Respondent instituted office procedures and safeguards, Judge Gordy found no evidence to show that they were fully understood by the bookkeepers or that Respondent ensured that they were followed. Relying on the fact that Respondent was the only person authorized to write checks on the escrow account and that the escrow account was not holding funds for a great number of clients, Judge Gordy found that the Respondent had the knowledge that a transfer of certain monies was going to reduce the escrow account balance to an unacceptable level. He found by clear and convincing evidence that the Respondent failed to make reasonable efforts to ensure that the non-lawyers' conduct was compatible with his legal obligations, thereby constituting a violation of Rule 5.3(c).

Assuming *arguendo* that Respondent had no knowledge of the deficit, "had the respondent exercised a reasonable degree of supervision over [employee], he might have detected her error before any ethical proscriptions had been violated." *See Attorney Griev. Comm'n v. Dacy,* 313 Md. 1, 5, 542 A.2d 841, 843 (1988). On at least one occasion, Respondent was informed that his accounts were "in a jumble." We believe that Respondent is responsible for the failure of his employees to bring to his attention the invasion of the escrow account. Judge Gordy's findings were not clearly erroneous and we overrule Respondent's exception.

### Violation of § 10–306 of the Business Occupations and Professions Article

Respondent next excepts to Judge Gordy's finding that he violated § 10–306. He contends that "wrongful use of trust funds, as contemplated by § 10–306 clearly suggests an essential element of proof being 'intent.'" Again, his exception is based on his asserted lack of knowledge that the account did not contain sufficient funds to make immediate distribution to

Hilnbrand, Wolf and any lienholders. He also argues that in order to sustain this violation, Bar Counsel must establish the improper purpose for which the funds were used.

Section 10–306 provides that:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

In order to trigger disciplinary proceedings under the Maryland Rules, however, § 10–307 requires that the attorney's violation of § 10–306 must be *willful.* [10]    Section 10–606(b) renders any willful violation of § 10–306 a misdemeanor.

The escrow account was indisputably out of trust, in violation of § 10–306; we conclude, however, that Bar Counsel did not establish by clear and convincing evidence that Respondent's violation of § 10–306 was willful. In *McBurney v. State,* 280 Md. 21, 371 A.2d 129 (1977), we observed that while the "willfulness" element of § 10–307 does not require proof of a specific criminal intent, it does require at least proof of a general intent. *Id.* at 29 & n. 6, 371 A.2d at 134 & n. 6 ("A practical effect of the requirement of a 'wilful' violation ... is to remove the offenses beyond any doubt from being considered as *malum prohibitum* which would dispense with the necessity for even a general criminal intent so that the mere fact of the commission of the prohibited acts would support a conviction."). Although *McBurney* involved criminal charges rather than disciplinary sanctions, we believe the interpretation of the "willful" requirement is relevant to disciplinary proceedings.[11]    Judge Gordy's finding that "[i]n absence of evidence that the escrow's deficit was caused by an appropri-

---

**10.** Section 10–307 provides that:

A lawyer who *willfully* violates any provision of this Part I of this subtitle, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this subtitle, is subject to disciplinary proceedings as the Maryland Rules provide.
(emphasis added).

**11.** *See supra* note 7.

ate reimbursement or legal fee ... Respondent *must have* misused those monies" does not demonstrate willfulness. We shall therefore sustain Respondent's exception to Judge Gordy's conclusion that he violated § 10–306.

### III. Sanctions

■ Having found misconduct, we must now determine an appropriate sanction to be imposed. In doing so, we recognize that sanctions are imposed to protect the public and the integrity of the legal profession, and not to punish the lawyer. *Attorney Griev. Comm'n v. Powell,* 328 Md. 276, 300, 614 A.2d 102, 114 (1992).

Bar Counsel recommends that the Respondent be disbarred for misappropriating client funds. He relies on our cases and on Standard 4.11 of the ABA Standards for Imposing Lawyer Sanctions, *reprinted in Selected Statutes, Rules and Standards on the Legal Profession* 301 (1987) (*ABA Standards* ), for the proposition that disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. Alternatively, Bar Counsel contends that if this Court finds that the misuse of client funds was without knowledge, disbarment is still the appropriate sanction. As further support for disbarment, Bar Counsel argues that a violation of Rule 8.4 calls for disbarment under ABA Standard 5.11(b). That standard provides that when "a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice," disbarment is generally appropriate. *ABA Standards, supra,* Standard 5.11(b), at 317.

Respondent suggests that the duty violated with respect to his trust account was "a degree of negligence in hiring supposedly untrained part-time bookkeepers." Respondent refers us to the ABA Standards and suggests that if this Court finds lawyer misconduct, the Court fashion an appropriate sanction in accord with the ABA framework.

The severity of the sanction depends upon the facts and circumstances of the case, taking account of any particular aggravating or mitigating factors. *Attorney Griev. Com'n v. Myers*, 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994). Along with our own cases as precedent in determining the appropriate sanction, it is helpful for us to refer to the ABA Standards. These standards create an organizational framework that calls for a consideration of four questions:

(1) What is the nature of the ethical duty violated?

(2) What was the lawyer's mental state?

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?

(4) Are there any aggravating or mitigating circumstances?

*See ABA Standards, supra*, Standard 3.0, at 300.

First, we find that by his actions, Respondent violated a duty to his clients, to the public, and to the profession. In violating Rule 1.15 and Rule BU9, Respondent misappropriated client funds. Misappropriation is "any unauthorized use by an attorney of [a] client's funds entrusted to him [or her]," whether or not temporary or for personal gain or benefit. *In re Harrison*, 461 A.2d 1034, 1036 (D.C.App.1983) (adopting definition of "misappropriation" from *Matter of Wilson*, 81 N.J. 451, 409 A.2d 1153, 1155 n. 1 (1979)). *See In re Pels*, 653 A.2d 388, 393–94 (D.C.App.1995). *See also Attorney Griev. Comm'n v. Keister*, 327 Md. 56, 65 & n. 11, 607 A.2d 909, 913 & n. 11 (1992) (citing *In re Harrison* with apparent approval). When Respondent's escrow account balance fell below the amount required to satisfy the obligations due to the Hilnbrands and the Wolfs, and he failed to provide a satisfactory explanation, he misappropriated their funds. Whether he did so intentionally, knowingly or negligently is another question. In violating Rule 5.3(b) and (c), Respondent's conduct resulted in the misappropriation of client funds. In violating Rule 8.4(c), Respondent breached his duty to the legal profession and to the public.

Next, we turn to the heart of Respondent's argument: his mental state at the time of the violations. We shall consider

whether Bar Counsel established by clear and convincing evidence that Respondent acted intentionally, knowingly or negligently.

The ABA Standards establish graduated levels of culpability, with the most culpable mental state that of intent, the next most culpable mental state that of knowledge, and the least culpable mental state that of negligence. *ABA Standards, supra,* Standard 3.0 cmt., at 300. Intent is defined as "the conscious objective or purpose to accomplish a particular result." *Id.* (Definitions), at 287. Knowledge is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* Negligence is defined as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.* at 287–88.

"Knowing misappropriation" was defined in *Matter of Roth,* 140 N.J. 430, 658 A.2d 1264 (1995), as the taking by a lawyer of "a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *Id.* 658 A.2d at 1272 (quoting *In re Noonan,* 102 N.J. 157, 506 A.2d 722, 723 (1986)). Proving a state of mind is difficult and often must be established by circumstantial evidence. In this regard, the New Jersey Supreme Court observed:

> The line between knowing misappropriation and negligent misappropriation is a thin one. 'Proving a state of mind—here, knowledge—poses difficulties in the absence of an outright admission.' However, this Court has noted that 'an inculpatory statement is not an indispensable ingredient of proof of knowledge, and that circumstantial evidence can add up to the conclusion that a lawyer 'knew' or 'had to know' that clients' funds were being invaded.' In this case, that circumstantial evidence includes repeated invasions of client funds that were required to be held inviolate. The

testimony adduced convincingly suggests that respondent 'knew,' or 'had to know' that he was invading client funds. *Id.* 658 A.2d at 1273 (citations omitted).

Woven through Judge Gordy's findings of fact and conclusions of law, he discussed Respondent's state of mind and his level of knowledge, sometimes finding actual knowledge and other times inferring knowledge.[12] He rejected Respondent's

---

**12.** At one point, Judge Gordy said:

Although Respondent testifies that he was not made aware that the shortages existed, or even the probability that they were about to occur, this court finds that Respondent, the individual with signature authority, *had the knowledge* that a transfer of certain monies was going to bring the escrow account balance to an unacceptable minimum. This is especially true in the instance where the escrow account fell into the mere hundreds. At that time, Respondent *could not have been ignorant* to the fact that the escrow account may have been in grave jeopardy. The evidence illustrates that the escrow account was not holding funds for such a voluminous number of clients that Respondent could not ascertain that the balance was or about to become rather low.

In contrast, Judge Gordy also found:

[T]he Respondent testifies that he was aware that there were two instances in which the escrow account balance on the Hilnbrand and Wolf file descended below the amount necessary to fulfill the settlement obligation due to the client. These shortages occurred once in 1991, and once in 1991; and also constitute violations of Rule 1.15(a).

\*     \*     \*     \*     \*     \*

And, most significantly, Respondent admits to two shortfalls in the escrow account, one in 1991 and one in 1992. *However, the shortfalls were brought to his attention as a result of investigation triggered by this Petition.* (emphasis added)

In addition, however, Judge Gordy found:

This Court makes the factual finding that no shortages were revealed because the escrow account was not thoroughly investigated by Respondent or an employee. The testimony indicates that neither bookkeeper would've determined a shortage because neither adequately reconciled the escrow account.

Judge Gordy also found:

[T]he facts indicate that Respondent needed to transfer from the firm account to the escrow account to make his clients whole. This Court logically draws the inference that there would be no need to compensate the clients if their funds had not previously been invaded.

\*     \*     \*     \*     \*     \*

[T]he circumstances presented to this Court illustrate that the Respondent was actually *replacing* funds that, pursuant to the Rules, were to be kept separate from the Respondent's funds.

claim of ignorance about the escrow deficit until he met with the Bar Counsel investigator. The line between knowing conduct and gross negligence in this case is a thin one and difficult to draw. Based on the record, we find that Respondent knew, or should have known, that when he wrote checks on the attorney trust account, the balance would be insufficient to satisfy his obligations to Wolf and Hilnbrand. Respondent's conduct was at least grossly negligent. We do not find, however, that the evidence is sufficient to conclude that he acted intentionally.

In this case, as in the New Jersey case, the circumstantial evidence includes repeated invasions of the trust account, with deposits into that account drawn on the firm account, on the same dates that Respondent was writing checks to the clients. Respondent's deposits into that account did not cure the breach of trust, "for 'restitution is not a defense to the charge of having misappropriated trust funds.' " *In re Pels,* 653 A.2d at 394 (quoting *Matter of Burton,* 472 A.2d 831, 838 (D.C.App. 1984), *cert. denied,* 469 U.S. 1071, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984)). "In short, a trust account is a trust account, not one dependent on discretionary infusions of money from another source." *Id.*

As the only person authorized to write checks on the escrow and firm accounts, at a minimum, Respondent should have known when the balance would fall below the acceptable level. In addition, the record is replete with evidence that Respondent was put on notice that his escrow account should be more closely scrutinized. In 1987, at the time of the dissolution of his former practice, a shortage was identified and cured. Respondent admitted in his pleadings that he had been informed by his former partner in 1987 that there was a shortage in the trust account. This reflects that Respondent had notice that problems may arise in escrow accounts when responsibility for them is delegated to others.

Respondent initiated escrow account controls in his office manual. And, although Judge Gordy concluded that Respondent devised measures to ensure that the non-lawyer employ-

ees acted in a manner compatible with his obligations as an attorney, and that Respondent made reasonable efforts to ensure that his bookkeepers did not withdraw clients' funds, he nonetheless failed to heed the 1987 warning that procedural manuals in and of themselves do not take the place of personal supervision. Further, sometime during the period of 1989 to 1990, he was told by his bookkeeper that his accounts were "in a jumble." He admits that he did not examine the bank statements, nor did he examine checks presented to him for his signature. Finally, he learned in June, 1992, two months prior to his meeting with the Bar Counsel investigator, that a check drawn on his escrow account had not been honored. Indeed, as regards the returned check he admits that his failure to examine checks he was signing was an act of neglect.

The third factor we must consider is the extent of the actual or potential injury caused by the lawyer's misconduct. Judge Gordy did not find that Respondent acted intentionally. With respect to the college aid application, although a showing of harm is not a defense to the violation, the record is devoid of evidence as to whether the Hilnbrands submitted a misleading application or received any money as a result of the misrepresentation.

Finally, we consider the presence of aggravating or mitigating factors.[13] The mitigating factors listed in the ABA Standards include: absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of

---

13. ABA Standard 9.21 defines "Aggravation" as any considerations or factors that may justify an increase in the degree of discipline to be imposed. ABA Standard 9.31 defines "Mitigation" as any consideration that may justify a reduction in the degree of discipline to be imposed. *ABA Standards, supra,* Standards 9.21 & 9.31, at 333–34.

prior offenses. *ABA Standards, supra,* Standard 9.32, at 334. We note that "the client made me do it" is not a mitigator. *Id.,* Standard 9.4 cmt., at 336–37.

Respondent has been an upstanding member of the Bar of this State since 1963. He has had no prior discipline actions against him. He has achieved and maintained an "AV" rating with Martindale Hubble and has been a leader in the Maryland State Bar Association, where he has served as chair of many bar sections. He has lectured at the Maryland Judicial Institute, at local colleges and law schools, and for the American Bar Association and the Maryland State Bar Association. He served as a volunteer chair of the Maryland State Bar Association Insurance Trust and as a member of the Attorney Grievance Commission Inquiry Panel from 1975 through 1986. Respondent cooperated completely with Bar Counsel during the investigation of this matter, providing full and free disclosure to the investigator, and immediately after meeting with the investigator, he initiated additional procedures within his firm to avoid a recurrence.

We next consider our prior cases involving similar misconduct to determine an appropriate sanction. We have consistently found misappropriation by an attorney of entrusted funds, be it intentional, knowing, or negligent, to be of great concern, representing serious professional misconduct. *Attorney Griev. Comm'n v. Drew,* 341 Md. 139, 669 A.2d 1344 (1996). Although in this case, neither client suffered actual financial loss, misappropriation is a most egregious violation even without actual loss, because the failure to keep client funds separate subjects the funds to the claims of creditors of the lawyer. The rule is concerned with the risk of loss, not only the actual loss. *See Attorney Griev. Comm'n v. Goldberg,* 292 Md. 650, 658, 441 A.2d 338, 342 (1982) (although the attorney was "fortunate, under the circumstances, that there appears to have been no actual loss to his clients by virtue of the negative balances in his escrow account," we concluded that "[n]onetheless, the public must be protected."). *See also In re Pels,* 653 A.2d 388, 394 (D.C.App.1995); *In re Bizar,* 97 Ill.2d 127, 73 Ill.Dec. 411, 412, 454 N.E.2d 271, 273

(1983). We have often noted that "[m]isappropriation of funds by an attorney involves moral turpitude; it is an act infected with deceit and dishonesty and will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Attorney Griev. Comm'n v. Ezrin*, 312 Md. 603, 608–09, 541 A.2d 966, 969 (1973).

We recently had occasion in the case of *Attorney Griev. Comm'n v. Drew*, 341 Md. 139, 669 A.2d 1344 (1996) to survey our cases addressing misappropriation. In *Drew*, we found the attorney's conduct most comparable to the conduct at issue in *Attorney Griev. Comm'n v. Berger*, 326 Md. 129, 604 A.2d 58 (1992), and *Attorney Griev. Comm'n v. Kramer*, 325 Md. 39, 599 A.2d 100 (1991). In *Berger*, the trial judge found that Bar Counsel did not establish by clear and convincing evidence that Berger knowingly misappropriated client funds. 326 Md. at 130, 604 A.2d at 58. The judge found, however, that Berger's acts amounted to "gross and wanton negligence amounting to a total disdain and disregard for his duties to safeguard his client's money." *Id.* at 130–31, 604 A.2d at 58. Berger received an indefinite suspension, with the right to reapply after one year. *Id.* at 131, 604 A.2d at 59. In *Attorney Griev. Comm'n v. Kramer*, 325 Md. 39, 599 A.2d 100 (1991), another misappropriation case, we concluded that Kramer's failure to maintain records or to render an accounting of the funds that were in his escrow account, along with his inability to explain what became of the money, amounted to "at least gross negligence." *Id.* at 51, 599 A.2d at 106. Kramer received an indefinite suspension with the right to reapply after one year. *Id.* at 54, 599 A.2d at 108. In *Drew*, the trial judge found that the attorney failed to keep clients' funds separately for two years, that there were numerous invasions and infusions into the escrow account, and that there were twenty-three overdrafts. *Drew*, 341 Md. at 145, 669 A.2d at 1346. The trial judge found that the misappropriation was not intentional and that Drew's motives were honest. *Id.* at 7, 152, 669 A.2d at 1350. Drew received an indefinite suspension with the right to reapply after one year. *Id.* at 154, 669 A.2d at 1351.

In addressing the sanction for failure to preserve the client's property, in the absence of a knowing conversion of client property that causes injury or potential injury to the client, ABA Standard 4.12 finds suspension to be appropriate.

Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

*ABA Standards, supra,* Standard 4.12, at 302. In the commentary to Standard 4.13, *id.* at 303, the ABA recommends that "lawyers who are grossly negligent in failing to establish proper accounting procedures should be suspended; reprimand is appropriate for lawyers who simply fail to follow their established procedures." We find Respondent's case to be comparable to *Drew, Berger* and *Kramer.* We also find Respondent's case to fall within ABA Standard 4.12, and therefore determine that the appropriate sanction is an indefinite suspension. Accordingly, we shall enter the following order:

1. Glenn is indefinitely suspended from the practice of law, effective thirty days after the filing of this opinion.

2. Glenn shall:

(a) Within five days from the date of filing of this opinion, provide Bar Counsel with the names and addresses of his current clients and identify client matters currently pending in court; and

(b) Within fifteen days from the date of filing of this opinion provide Bar Counsel with a copy of a letter mailed by Glenn to each such client, and to counsel for any adverse party or to any unrepresented adverse party, notifying them of this indefinite suspension.

3. Glenn may apply for reinstatement not earlier than one year from the effective date of this suspension and upon having satisfied Bar Counsel that the following conditions have been met:

(a) Glenn shall have engaged, at his expense, a monitor, acceptable to Bar Counsel, who will oversee Glenn's ac-

counting for funds entrusted to him, subject to further order of this Court;

(b) Glenn shall have complied with all the conditions of paragraph 2 of this order; and

(c) Glenn shall have paid all costs assessed pursuant to the mandate in this matter.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15(c), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JOHN WHEELER GLENN.*