31 A.3d 110

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

### Brenda Carol BRISBON.

**Misc. Docket AG No. 28, Sept. Term, 2010.**

Court of Appeals of Maryland.

Oct. 26, 2011.

Glenn M. Grossman, Bar Counsel of Attorney Grievance Commission of Maryland, for Petitioner.

C. Justin Brown of Law Offices of C. Justin Brown, Baltimore, MD, for Respondent.

Argued before BELL, C.J., BATTAGLIA, GREENE, * MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

Brenda C. Brisbon, Respondent, was admitted to the Maryland Bar on December 20, 1977, and was indefinitely suspended from the practice of law on March 17, 2005. *Attorney Grievance Commission v. Brisbon,* 385 Md. 667, 676, 870 A.2d 586, 591 (2005). On August 23, 2010, the Attorney Grievance Commission of Maryland, Petitioner, filed a PETITION FOR DISCIPLINARY OR REMEDIAL ACTION against Respondent. On August 24, 2010, this Court ordered that the charges against Respondent "be heard and determined by

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Judge Charles J. Peters, of the Eighth Judicial Circuit [the Hearing Judge], in accordance with 16–757[.]" The Hearing Judge filed "FINDINGS OF FACT AND CONCLUSIONS OF LAW" in which he concluded that Respondent "engaged in the unauthorized practice of law [i]n acting as an 'immigration consultant' for [Mr. Kobina Nkrumah, and his wife, Nicole Smoot–Nkrumah]," and, as a result, "violated Maryland Lawyers' Rules of Professional Conduct [ (MRPC) ] 1.1, 1.4, 1.5, 5.5, and 8.4(a), (b), (c) and (d)."

Respondent noted seven EXCEPTIONS to the Hearing Judge's findings and conclusions. Three exceptions complain that the Hearing Judge's findings and conclusions did not include any discussion of (1) Respondent's background, (2) the fact that there were two "immigration consultant" signs outside Respondent's office, and (3) the fact that Respondent used a computer program to complete the immigration forms that she prepared for Mr. and Mrs. Nkrumah. Two exceptions complain that the Hearing Judge made erroneous factual findings. Two exceptions involve Respondent's assertion that (in the words of her Exceptions), "Bar Counsel failed to show by clear and convincing evidence that [Respondent] committed unauthorized practice of law." For the reasons that follow, we shall overrule each of Respondent's exceptions, and order that she remain suspended indefinitely from the practice of law.

## Background

MRPC 1.1, in pertinent part, states that a lawyer "shall provide competent representation to a client." MRPC 1.4(a)(4), in pertinent part, states that a lawyer "shall consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law." MRPC 1.5(a), in pertinent part, states that a lawyer "shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." MRPC 5.5(a), states that "a lawyer shall not practice law in a jurisdiction in violation of the

regulation of the legal profession in that jurisdiction, or assist another in doing so."

MRPC 8.4, in pertinent part, provides:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

The record includes the following "STIPULATIONS OF FACT" signed by the Respondent, Respondent's hearing counsel, and Bar Counsel:

The Petitioner, the Attorney Grievance commission of Maryland, by its attorney, Gail D. Kessler, and the Respondent, Brenda C. Brisbon, through her attorney, [ ], stipulate that the following facts are true:

\* \* \*

5. That since Respondent was indefinitely suspended on March 17, 2005, she has not been reinstated to the Maryland State Bar or admitted to any State Bar.

6. On June 20, 2008, Kobina Nkrumah met with the Respondent at her office in Baltimore City

7. On June 20, 2008, Respondent accepted a $100.00 fee for her consultation with Kobina Nkrumah about handling Mr. Nkrumah's immigration matter.

8. Respondent never told Mr. Nkrumah and/or Mrs. Smoot[-]Nkrumah that she was not admitted to the Maryland State Bar and could not practice law.

9. Respondent never told Mr. Nkrumah and/or Mrs. Smoot[-]Nkrumah that she was not admitted to any Bar.

10. Mr. Nkrumah and Mrs. Smoot–Nkrumah paid Respondent $1,200.00 to handle Kobina Nkrumah's immigration matter.

11. Respondent gave Kobina Nkrumah a July 2008 receipt for payment of $600.00. That receipt identified the Respondent as an attorney. July 11, 2008 receipt attached hereto and incorporated herein as exhibit number 3.

12. At one of Respondent's meetings with Mr. Nkrumah and/or Mrs. Smoot–Nkrumah, she gave them a document titled "Additional Documents Needed for Adjustment of Status (Form I–485)[."] Document titled "Additional Documents Needed for Adjustment of Status["] (Form I–485) attached hereto and incorporated herein as exhibit number 4.

13. The handwriting titled "Additional Documents Needed for Adjustment of Status" (Form I–485) marked exhibit number 4 herein, is Respondent's handwriting.

14. Mr. Nkrumah and Mrs. Smoot–Nkrumah gave Respondent two money orders totaling $1,365.00 to be submitted with their application forms to The Department of Homeland Security, United States Citizenship and Immigration Services. The two money orders totaling $1,365.00 are attached hereto and incorporated herein as exhibit number 5.

15. Respondent prepared Mr. Nkrumah and Mrs. Smoot–Nkrumah's application forms that were submitted to The Department of Homeland Security, United States Citizenship and Immigration Services. Mr. Nkrumah and Mrs. Smoot–Nkrumah's application forms are attached hereto and incorporated herein as exhibit numbers 6, 7, 8, 9, and 10 herein.

16. Respondent submitted Mr. Nkrumah and Mrs. Smoot–Nkrumah's application forms, marked exhibit numbers

6, 7, 8, 9, and 10 herein to The Department of Homeland Security, United States Citizenship and Immigration Service along with her letter dated July 15, 2008. Respondent's letter dated July 15, 2008 attached hereto and incorporated herein as exhibit number 11.

17. Respondent agreed to represent Mr. Nkrumah and Mrs. Smoot–Nkrumah at their January 22, 2009 interview/meeting with The United States Citizenship and Immigration Services. Request for Applicant to Appear for Initial Interview attached hereto and incorporated herein as exhibit number 12.

18. Respondent failed to appear at Mr. Nkrumah and Mrs. Smoot–Nkrumah's January 22, 2009 scheduled interview/meeting with The United States Citizenship and Immigration Services. She had been admitted to the hospital the day before the scheduled meeting, and was not discharged until January 26, 2009.

The Hearing Judge's FINDINGS OF FACT AND CONCLUSIONS OF LAW included the following findings and conclusions:

The Court finds the following facts have been established by clear and convincing evidence:

\* \* \*

7. In 2006 or 2007, the Respondent opened an office as an "Immigration Consultant at 228 East 25th Street, First Floor, Baltimore, Maryland 21218. On the Respondent's "Immigration Consultant" stationary, the Respondent listed the same telephone number, (410) 467–3833, and facsimile number, (410) 467–1165, used by the Respondent for her law practice ... The Respondent also produced business cards listing:

BRENDA C. BRISBON, P.A.

IMMIGRATION CONSULTANT

Although the Respondent used the title of "Brenda C. Brisbon, P.A.," she was unable to state whether or not her professional association was still in existence in 2008.

8. Other than chance observations by the Respondent of two unidentified men who claimed to be immigration consultants, the Respondent failed to take any steps to familiarize herself with the legal limitations and duties of an immigration consultant. The Respondent was not familiar with the Maryland Immigration Consultant Act ("MICA"), §§ 14–3301 to –3306 of the Commercial Law Article. The Respondent worked as an immigration consultant for clients other than the Complainant in this case. The number of clients, however, was never provided to the Court. As part of her duties as an immigration consultant, the Respondent testified that she would fill out forms, assist clients in filling out forms, and submit the completed forms to the United States Citizenship and Immigration Services ("USCIS").

9. On June 20, 2008, Kobina Nkrumah ("Nkrumah" or "Mr. Nkrumah") met with the Respondent at her office located at 228 East 25th Street, First Floor, Baltimore, Maryland 21218. At that meeting the following occurred:

a. Nkrumah advised the Respondent that he had recently married an American citizen and that he wanted his new wife to sponsor him for status as a permanent resident in the United States. According to Respondent, Nkrumah's case presented a "potential difficulty," as Nkrumah had made the same request to the USCIS on a previous occasion based on an earlier marriage to another American Citizen.

b. The Respondent agreed to fill out the necessary forms for this process and submit the forms to the USCIS. The Respondent provided Mr. Nkrumah with a list entitled "Additional Documents Needed for Adjustment of Status (Form I–285)"... The Respondent also wrote information about fee on this list.

c. Nkrumah and the Respondent agreed that the fee for these services would be $1,000. The Respondent charged Nkrumah $100 as an initial consultation fee. No written contract or agreement was ever executed.

d. The respondent filled out a form entitled "Initial Consultation Sheet" with the following heading:

*Law office of*
**BRENDA C. BRISBON, P.A.**

The Court does not find that this form was shown to Mr. Nkrumah. The Form shows that the Respondent engaged in an extensive interview with Mr. Nkrumah and obtained significant personal and legal information, including Mr. Nkrumah's marital status and employment history, as well as the history of any prior immigration filings.

10. On July 11, 2008, Mr. Mkrumah and his wife, Nicole Smoot–Nkrumah, met with th Respondent. At that meeting, the following occurred:

a. The respondent prepared the following forms:

(1) I–130, Petition for Alien Relative . . .

(2) I–485, Application to Register Permanent Residence or Adjust Status . . .

(3) I–765, Application for Employment Authorization . . .

(4) G–325A, Biographic Information for both Mr. Nkrumah and Mrs. Smoot–Nkrumah . . .

(5) I–864, Affidavit of Support Under Section 213A of the Act . . .

Although the I–130, I–485, and I–765 forms had signature lines for the "person preparing" such forms, the Respondent failed to sign any of the forms or note that she prepared the forms. Although the Respondent testified that these omissions were an "oversight," the Court does not find her testimony credible. The court finds that an oversight may have been failing to sign one form but not failing to sign all of the forms.

b. The Nkrumahs provided the Respondent with two money orders in the total amount of $1365 payable to the USCIS to cover the filing fees . . .

c. The Respondent agreed to accompany the Nkrumahs to their interview with the United States Immigration Officer for an additional fee of $200.

d. The Nkrumahs paid the Respondent $600, and the Respondent gave them a receipt for the payment ... The receipt was signed by the respondent and had the following heading:

**LAW OFFICE OF BRENDA C. BRISBON**

22 EAST 25TH STREET

Baltimore, MD 21218

TEL. (410) 467–3833

FAX: 410 467–1165

On the same date, prior to this meeting, the Respondent received in the mail a letter from a health insurance company ... denying the Respondent health insurance coverage. The letter included laboratory results indicating that the Respondent was [gravely ill]. The Respondent was emotionally distraught after the receipt of this information. Nonetheless, the Respondent decided to go ahead with the meeting with the Nkrumahs.

11. On July 15, 2008, the Respondent sent to the Nkrumahs by facsimile an "I 864A, Contract Between Sponsor and Household Member" ... The facsimile copy shows that the form had been sent "FROM THE LAW OFFICE, BRENDA BRISBON PHONE NO.:4104673833 Jul. 15 2008 02:14 P.M." The I–864A form sent by facsimile was executed by the Nkrumahs and then returned to the Respondent. The executed form was located in the Respondent's office file.

12. On or about July 22, 2008, the Respondent filed with the USCIS the documents she prepared on behalf of the Nkrumahs ... With these documents, she also submitted a cover letter, which identified the Respondent as an immigration consultant. She did not copy that letter to the Nkrumahs, nor was there testimony that she gave the Nkrumahs a copy of that letter.

13. On or about August 1, 2008, the Respondent sent a letter to Mr. Nkrumah stating that there had been "difficulties regarding the Form I–765 (Application for Employment Authorization)" ... The first Form I–765 submitted by the

Respondent was outdated, and the Respondent enclosed a current version of Form I–765. The Respondent prepared the form, but once again, she failed to sign the form as the preparer. Respondent's letter further explained to Mr. Nkrumah that there was no additional filing fee required and requested that the form be mailed directly to USCIS. The Respondent's letter was not on her Immigration Consultant letterhead. The Court finds that the Respondent never gave the Nkrumahs any document that would have identified the Respondent as an immigration consultant.

14. On or about October 22, 2003, the Respondent, as stated on "Status Notes and Communications" in Respondent's office file . . . called Mr. Nkrumah, and Mr. Nkrumah stated that he would send the Respondent a check for $300. The Respondent noted that the balance due as of that date was $600 for a total fee of $1200. This fee included the $200 charge for the Respondent's attendance at the Nkrumahs' interview with the United States Immigration Officer.

15. On or about October 27, 2008, the Nkrumahs received from the USCIS a "Request for Applicant to Appear for Initial Interview" scheduling the interview for December 18, 2008 . . . On or about November 13, 2008, the interview was cancelled by the USCIS.

16. On or about November 26, 2008, the Nkrumahs received another "Request for Applicant to Appear for Initial Interview" rescheduling the interview for January 22, 2009 . . . The Respondent was notified of this date. It is noted on the "Request for Applicant to Appear for Initial Interview" that the Nkrumahs could be accompanied by an "attorney or authorized representative." The Respondent testified that although she believed that this was a "gray area," she believed that she could accompany the Nkrumahs as an authorized representative. Under federal regulations, a person appearing before the USCIS may only be "represented by an attorney in the United States . . ., an attorney outside of the United states . . ., or an accredited representative." 8 C.F.R. § 103.2(a)(3). An accredited representative is defined as "[a] person representing an organization

described in [8 C.F.R. §] 292.2," 8 C.F.R. § 292.1(a)(4), which is "a non-profit religious, charitable, social service or similar organization established in the United States and recognized as such by the Board [of Immigration Appeals]," 8 C.F.R. § 292.2(a). The Respondent did not qualify as an accredited or authorized representative. The Court finds that the Respondent's testimony about a "gray area" was not credible. The Court finds that the Respondent, having practiced exclusively as an immigration lawyer for over ten years with approximately 2000 clients, would have been aware of the federal regulations governing such proceedings. The Respondent further testified that, in retrospect, her decision to agree to attend the interview was a "huge mistake." This Court finds that this statement was merely a post hoc characterization to disguise the Respondent's decision to attend the interview knowing that, as a suspended attorney, she was not authorized to attend.

17. The Respondent agreed to represent the Nkrumahs at their January 22, 2009, interview with the USCIS in Fairfax, Virginia. The Respondent, however, failed to appear at the Nkrumah's interview on January 22, 2009, because she was admitted to the hospital the day before the interview and was not discharged until January 26, 2009.

18. On or about January 25, 2009, the Respondent received a telephone call from the Nkrumahs, who were enraged by the failure of the Respondent to attend the interview. The Respondent testified that, at some point, she met with the Nkrumahs and offered to refund the fee she received from them. The Respondent testified, however, that the Nkrumahs told her to keep the money. The Court does not find this testimony credible.

19. As stipulated by the parties, the Respondent never told the Nkrumahs that she was not currently admitted to the Maryland State Bar and could not practice law. Although the Court finds that the Respondent was, at the very least, grossly negligent in her use of stationery and a facsimile transmission listing the Respondent as an attorney over three years after her suspension, because the Nkrumahs did

not testify and the Petitioner did not offer the testimony of any other client of the Respondent, this Court cannot find by clear and convincing evidence that the Respondent affirmatively represented herself as an attorney to the Nkrumahs.

### Conclusions of Law

\* \* \*

C. Respondent engaged in the Unauthorized Practice of Law.

This court finds by clear and convincing evidence that the Respondent engaged in the unauthorized practice of law. In acting as an "immigration consultant" for the Nkrumahs, the Respondent went far beyond "purely mechanical type functions[.]"

\* \* \*

. . . The Respondent engaged in an in-depth interview with Mr. Nkrumah in which the Respondent obtained significant personal and other legal information with the obvious intention of developing information to prepare the appropriate forms for an application to the USCIS to adjust Mr. Nkrumah's status to a permanent resident. In doing so, the Respondent necessarily analyzed what legally needed to be done, made a determination as to which forms would be needed for the application, and provided Mr. Nkrumah with a list of documents that he had to produce so that such documents could be attached to the proper forms submitted to the USCIS. At this first meeting alone, the Respondent engaged in the "preparation of legal documents, their interpretation, the giving of legal advice, [and] the application of legal principles to [complex] problems." *Lukas [v. Bar Ass'n of Montgomery County* ], 35 Md.App. [442], 448, 371 A.2d [669], 673 (1977). Consequently, she engaged in the practice of law.

At the July 11, 2008 meeting, moreover, this unauthorized practice of law continued. The Respondent finalized which forms were needed to obtain Mr. Nkrumah's permanent

resident status. She also prepared a form for an employment authorization for Mr. Nkrumah. As noted in [*Unauthorized Practice Comm. v.*] *Cortez,* 692 S.W.2d [47], 50 [ (Tex.1985) ], the Respondent's "selecting and preparing the various immigration forms required legal skill and knowledge." Further, "[t]he choice of a form and the information to include in its blanks can turn on subtle facts that may not be apparent to those without legal training." [*State ex rel. Indiana State Bar Ass'n v.*] *Diaz,* 838 N.E.2d [433], 445 [ (Ind.2005).] The Court would also note that under federal regulations, the practice of immigration law includes "the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with the [USCIS]." 8 C.F.R. § 1.1(i). Finally, the Respondent agreed to appear with the Nkrumahs in an interview with officials at the USCIS. Although the Respondent ultimately failed to appear, the Respondent engaged in the practice of law when she agreed to appear. See 8 C.F.R. § 1.1(i) ("The term practice means the act or acts of any person appearing in any case . . . on behalf of another person or client before or with DHS.").

The Respondent, thereafter, prepared additional forms, including "I–864A, Contract Between Sponsor and Household Member" . . . The preparation of this "contract," along with the earlier preparation of the companion I–864, Affidavit of Support Under Section 213A of the Act" . . . gives this Court great concern. Under the terms of the "contract" and the "affidavit," Mrs. Nkrumah agreed "to be jointly and severally liable" for significant financial support for Mr. Nkrumah. As noted in Gordon Mailman & Yale–Loehr, Immigration Law and Procedure, § 63.05, "[t]he I–864 process has caused much confusion, and . . . [b]ecause I–864 and any I 864A is a legally binding contract, [family] sponsors [i.e. Mrs. Smoot–Nkrumah] should take care in its execution." The Form I–864 itself has the following warning: "Please read the following information carefully before you sign the Form I–864. If you do not understand the obligations, you may wish to consult an attorney or accredit-

ed representative" . . . The appropriate preparation of these documents certainly constituted the practice of law because such preparation "require[d] more than the most elementary knowledge of the law, or more than that which the ordinary or average laymen may be deemed to possess." *Lukas,* 35 Md.App. at 448, 371 A.2d at 673.

The Respondent thereafter filed all of these documents with the USCIS. The Respondent further had communications with the USCIS and learned that one of the forms submitted was outdated. The Respondent prepared an updated form and sent it to Nkrumahs for their signature and later filing with the USCIS . . . All of these acts, the Court again concludes, constituted the unauthorized practice of law.

## Discussion

### I.

In *Attorney Grievance Comm'n v. Uguuonye,* 405 Md. 351, 952 A.2d 226 (2008), this Court stated:

"This Court has original and complete jurisdiction over attorney discipline proceedings" in Maryland. *Attorney Grievance Comm'n v. Adams,* 349 Md. 86, 93, 706 A.2d 1080, 1083 (1998). Even though conducting an independent review of the record, we accept the hearing judge's findings of fact unless they are found to be clearly erroneous. *Attorney Grievance Comm'n v. Zdravkovich,* 375 Md. 110, 126, 825 A.2d 418, 427 (2003). This Court gives deference to the hearing judge's assessment of the credibility of witnesses. *Id.* Factual findings by the hearing judge [that the Commission has satisfied its burden of persuasion] will not be interfered with if they are founded on clear and convincing evidence. *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002). All proposed conclusions of law made by the hearing judge, however, are subject to de novo review by this Court. *Attorney Griev-*

*ance Comm'n v. O'Toole,* 379 Md. 595, 604, 843 A.2d 50, 55 (2004).

*Id.* at 368, 952 A.2d at 235–36.

In *Atty. Griev. Comm'n v. Hallmon,* 343 Md. 390, 681 A.2d 510 (1996), this Court stated:

To determine what is the practice of law we must look at the facts of each case and determine whether they " ' "fall[ ] within the fair intendment of the term." ' " *In re Application of Mark W.,* 303 Md. 1, 8, 491 A.2d 576, 579 (1985) (quoting *Grievance Comm. v. Payne,* 128 Conn. 325, 329, 22 A.2d 623, 625 (1941)). The purpose of Rule 5.5 "is to protect the public from being preyed upon by those not competent to practice law—from incompetent, unethical, or irresponsible representation." *In re Application of R.G.S.,* 312 Md. 626, 638, 541 A.2d 977, 983 (1988). That "goal . . . is achieved, in general, by emphasizing the insulation of the unlicensed person from the public and from tribunals such as courts and certain administrative agencies." *Id.*

To determine whether an individual has engaged in the practice of law, the focus of the inquiry should "be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent." *In re Discipio,* 163 Ill.2d 515, 645 N.E.2d 906, 910, 206 Ill.Dec. 654 (1994); *Louisiana State Bar Ass'n v. Edwins,* 540 So.2d 294, 299 (La.1989) ("Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer."). "Where trial work is not involved but the preparation of legal documents, their interpretation, the giving of legal advice, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law." *Lukas v. Bar Ass'n of Montgomery County,* 35 Md.App. 442, 448, 371 A.2d 669, 673, cert. denied, 280 Md. 733 (1977) (quoting F.T. vom Baur, Administrative Agencies and Unauthorized Practice of Law, 48 A.B.A. J. 715, 716 (1962)).

*Id.* at 397–98, 681 A.2d at 514.

In *Public Service Com. v. Hahn Transp., Inc.,* 253 Md. 571, 253 A.2d 845 (1969), this Court stated:

Under our constitutional system of separation of powers, the determination of what constitutes the practice of law and the regulation of the practice and of its practitioners is, and essentially and appropriately should be, a function of the judicial branch of the government. In many States it has been held that the legislative branch cannot constitutionally exercise that judicial function although it may make implementing regulations. In Maryland there has always been a comfortable accommodation in this area ... The legislature has forbidden the practice of law by one not a lawyer ... but it consistently has recognized that the courts can and should decide in any instance presented to what does and what does not constitute the practice of law.

\* \* \*

The fact that the legislature has occasionally spoken in specified areas on unlawful practice does not mean that it has attempted to exclude judicial or quasi-judicial bodies from acting at all or in other areas. For example, the legislative choice to specify that no person but a lawyer should be allowed a fee for appearing before the Unemployment Security Board means no more, it would seem, than the desire to offer simple protection to extremely vulnerable people, largely unable or unwilling as a practical matter to defend themselves, from being preyed on.

*Id.* 583–584, 253 A.2d at 851. (Internal citations omitted).

We reject the argument that the Hearing Judge erred in finding by clear and convincing evidence that Respondent "engaged in the unauthorized practice of law [i]n acting as an 'immigration consultant' for the Nkrumahs." In its "desire to offer simple protection to extremely vulnerable people, largely unable or unwilling as a practical mater to defend themselves, from being preyed on," the General Assembly has enacted the *Maryland Immigration Consultant Act* (MICA), which is codified in §§ 14–3301 to –3306 of the Commercial Law Article. The legislative history of this statute makes it clear that MICA was enacted to curtail some of the "egregious practices

that ... immigration consultants [had engaged in]." [1] Section 14–3301, in pertinent part, provides:

§ 14–3301. Definitions

(a) In general.—In this subtitle the following words have the meanings indicated.

\* \* \*

(c) Immigration consultant.—"Immigration consultant" means a person that provides nonlegal advice, guidance, information, or services to a client on an immigration matter for a fee.

(d) Immigration matter.—"Immigration matter" means any legal proceeding, filing, or action that:

(1) Affects the immigration status of a noncitizen; and

(2) Arises under:

(i) Any immigration and naturalization law, executive order, or presidential proclamation of the United States or any foreign country; or

(ii) An action of the United States Department of Homeland Security, the United States Department of

---

1. The legislative history includes a letter written by Muriel van den Berg (Staff Attorney) and Janet L. Henry (Accredited Representative) of Catholic Charities–Immigration Legal Services, in which they identify the following "egregious practices" of some unscrupulous immigration consultants:

1) recommending that applicants for citizenship seek fraudulent medical disability waivers of the English and government exam required for U.S. citizenship;

2) advising clients that they qualify for a benefit such as Temporary Protected Status, when they clearly do not qualify and should not apply;

3) filing incompetent Motions to Reopen cases before the Immigration Court when clients only have one chance under the law to file a successful motion to reopen;

4) telling people that they are attorneys or leading them to believe that they are attorneys until the critical moment in the Immigration Court or before Immigration Services;

5) filling out applications with false information without the client's knowledge of the misrepresentation;

6) refusing to give clients copies of their files; and

7) threatening people when they seek a refund or ask too many questions.

Labor, the United States Department of State, the United States Department of Justice, or the United States Department of Commerce.

(e) Legal services.—

(1) "Legal services" means the legal representation of an individual.

(2) "Legal services" includes providing forms to an individual, completing forms on behalf of an individual, filing forms on behalf of an individual, advising an individual to file forms, or applying for a benefit on behalf of an individual.

From our review of the record, it is clear that Respondent "provided legal services" and engaged in the "unauthorized practice of law" when she acted as an immigration consultant for the Nkrumahs. Accordingly, we sustain the Hearing Judge's finding that Respondent violated Rule 5.5.

The Respondent also noted exceptions to the Hearing Judge's conclusions that she had violated rules 1.1, 1.4, 1.5 and 8.4(a), (b), (c) and (d). As Respondent concedes, however, these exceptions have no merit unless this Court holds that she was not engaged in the unauthorized practice of law. Because she did engage in the unauthorized practice of law, these exceptions are also overruled.

## II. Respondent's Sanction

In imposing the appropriate sanction, this Court has repeatedly emphasized three vital considerations. First, "each attorney grievance case rests on its own merits." *Attorney Grievance Comm'n v. Garcia*, 410 Md. 507, 529, 979 A.2d 146, 159 (2009). Second, "the purpose of attorney disciplinary proceedings is not to punish the erring attorney, only to protect the clients whom attorneys serve." *Attorney Grievance Comm'n v. Elmendorf*, 404 Md. 353, 363, 946 A.2d 542, 548 (2008). Third, as this Court stated in *Attorney Grievance Comm'n v. Taylor*, 405 Md. 697, 955 A.2d 755 (2008):

The public is best protected when sanctions are imposed commensurate with the nature and the gravity of the mis-

conduct and the intent with which it was committed. *Attorney Grievance Comm'n v. Reinhardt,* 391 Md. 209, 223, 892 A.2d 533, 541 (2006).

The severity of the sanction depends upon the facts and circumstances of the case, taking account of any particular aggravating or mitigating factors. *Attorney Griev. Comm. v. Glenn,* 341 Md. 448, 484, 671 A.2d 463, 480 (1996). In determining the appropriate sanction, we have often looked to the American Bar Association's Standards for Imposing Lawyer Sanctions, reprinted in LAWYERS' MANUAL ON PROFESSIONAL CONDUCT (2003) (ABA Standards). *Id.* at 488, 671 A.2d at 483. These standards create an organizational framework that calls for a consideration of four questions: (1) What is the nature of the ethical duty violated?; (2) What was the lawyer's mental state?; (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?; and (4) Are there any aggravating or mitigating circumstances? See ABA Standards, Standard 3.0, at 17. Also relevant are the following ["mitigating"] factors:

"Absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses."

*Id.* at 488–89, 671 A.2d at 483 (quoting ABA Standards, Standard 9.32, at 41–42).

*Id.* at 720–21, 955 A.2d at 768–69.

 Petitioner recommends that Respondent be disbarred. That is not an unreasonable recommendation, and would ordinarily be imposed on a former lawyer who engaged in the unauthorized practice of law at a time when—by order of this

Court—the former lawyer had no right to do so. In the case at bar, however, Respondent's counsel requests that this Court continue Respondent's indefinite suspension. In support of that request, Respondent's counsel asserts:

> As [Respondent] told the [C]ircuit [C]ourt, she has no intention of ever practicing law again. Nor does she intend to work as an immigration consultant. This is partly due to her declining health, and partly due to her plans to go to Africa in the near future to pursue a non-legal job there.
>
> Because [Respondent] will never practice again, and will never seek reinstatement, the public would be adequately protected by her continued suspension....
>
> Finally, [Respondent] has done a lot of good in her career, and she respectfully asks that the Court consider this. She has helped hundreds of clients, and gained neither fame nor fortune. The mistakes she made, and for which she has accepted responsibility, occurred at the end of her career, at a time when her physical health was failing. She only hopes now her name will not be permanently tarnished by disbarment.

In the case at bar, it is not necessary to disbar Respondent in order to send a clear message to the Bar that the sanction of disbarment will ordinarily be imposed for the unauthorized practice of law by a lawyer at a time when he or she was suspended from practice by order of this Court. Because Md. Rule 16–760(f) provides for the protection of the public by authorizing Bar Counsel to take further action against Respondent in the unlikely event that Respondent ever again engages in the unauthorized practice of law, in light of Respondent's failing health and intent to return to her homeland, we hereby order that the indefinite suspension imposed by this Court on March 17, 2005, be continued.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE**

ATTORNEY GRIEVANCE COMMISSION AND AGAINST BRENDA C. BRISBON.